**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| SETH WEINSHENKER for | ) |
| MELISSA WEINSHENKER (Deceased) | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      1:17CV4 |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social | ) |
| Security,[1] | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Seth Weinshenker, brought this action on behalf of
his deceased spouse, Melissa Weinshenker ("Claimant"), pursuant to
the Social Security Act (the "Act") to obtain judicial review of a
final decision of Defendant, the Acting Commissioner of Social
Security, denying Claimant's application for Disability Insurance
Benefits ("DIB").  (Docket Entry 1.)  Defendant filed the certified
administrative record (Docket Entry 6 (cited herein as "Tr. __")),
and Plaintiff moved for judgment (Docket Entry 8; see also Docket
Entry 9 (Plaintiff's Memorandum)).  In response, Defendant moved
for dismissal of the Complaint on the grounds that Plaintiff failed
to establish standing to pursue the instant action on behalf of
Claimant.  (Docket Entry 10; see also Docket Entry 11 (Defendant's
Memorandum).)  Plaintiff subsequently responded in opposition to

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January
23, 2017.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy
A. Berryhill should be substituted for Carolyn W. Colvin as the Defendant in this
suit.  No further action need be taken to continue this suit by reason of the
last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

that motion (Docket Entry 12), and Defendant replied (Docket Entry 13).  For the reasons that follow, the Court should enter judgment for Defendant.

## I.  PROCEDURAL HISTORY

Claimant applied for DIB.  (Tr. 299-307.)  Upon denial of that application initially (Tr. 148-59, 201-05) and on reconsideration (Tr. 160-74, 207-10), Claimant requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 211-12).  Claimant and her attorney attended the hearing.  (Tr. 71-98.)  The ALJ subsequently ruled that Claimant did not qualify as disabled under the Act.  (Tr. 175-86.)  The Appeals Council thereafter granted Claimant's request for review, and remanded the matter to the ALJ for further administrative proceedings.  (Tr. 192-96.)  The ALJ convened a second hearing, which Claimant, her attorney, Plaintiff, and a vocational expert ("VE") attended.  (Tr. 100-47.)  By decision dated June 24, 2015, the ALJ again ruled that Claimant did not rate as disabled under the Act.  (Tr. 8-23.)

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1.   [Claimant] last met the insured status requirements of the [] Act on December 31, 2013.

2.   [Claimant] did not engage in substantial gainful activity during the period from her alleged onset date of January 4, 2010, through her date last insured of December 31, 2013.

2

> 3.    Through the date last insured, [Claimant] had the
> following severe impairments: fibromyalgia, depression,
> and anxiety.
>
> . . .
>
> 4.    Through the date last insured, [Claimant] did not
> have an impairment or combination of impairments that
> meets or medically equaled the severity of one of the
> listed impairments in 20 CFR Part 404, Subpart P,
> Appendix 1.
>
> . . .
>
> 5.    . . . [T]hrough the date last insured, [Claimant]
> had the residual functional capacity to perform light
> work . . . .   She was limited to simple, routine,
> repetitive, unskilled work tasks, with only occasional
> contact with supervisors, coworkers and the public.
>
> . . .
>
> 6.    Through the date last insured, [Claimant] was unable
> to perform any past relevant work.
>
> . . .
>
> 10.   Through the date last insured, [c]onsidering
> [Claimant's] age, education, work experience, and
> residual functional capacity, there were jobs that
> existed in significant numbers in the national economy
> that [she] could have performed.
>
> . . .
>
> 11.   [Claimant] was not under a disability, as defined in
> the [] Act, from January 4, 2010, the alleged onset date,
> through December 31, 2013, the date last insured.

(Tr. 13-23 (bold font and internal parenthetical citations

omitted).)

Claimant passed away on July 5, 2015. (See Tr. 34-62.)  On

August 12, 2015, Claimant's attorney faxed the Appeals Council (1)

a cover letter enclosing a request for review "for the above

referenced [C]laimant" (referencing "<u>Mrs. Melissa Rogers Weinshenker</u>") (Tr. 32 (emphasis added)); (2) Social Security Administration Form HA-520-US (Request for Review of Hearing Decision/Order) on behalf of "<u>Melissa Rogers Weinshenker</u>" (Tr. 31 (emphasis added)); and (3) an Appointment of Representative from signed by "<u>Melissa Rogers Weinshenker</u>" on July 16, 2013 (Tr. 33 (emphasis added)). On October 8, 2015, Claimant's attorney sent the Appeals Council a letter (Tr. 400-05) containing argument "submitted in further support of the Request for Review previously filed herein <u>on behalf of the [C]laimant, Melissa Rogers Weinshenker</u> . . . ." (Tr. 400 (emphasis added)). In the five-page letter, Claimant's attorney did not mention that (1) Claimant had died; or (2) Plaintiff wished to be named a substitute party. (<u>See</u> Tr. 400-05.) Claimant's attorney enclosed "new and material and disability related evidence" (<u>id.</u>), which included medical records reflecting Claimant's death by suicide on July 5, 2015 (<u>see</u> Tr. 34-62).

On November 4, 2016, the Appeals Council sent a notice of its denial of Claimant's request for review (Tr. 1-7) to "<u>Ms. Melissa Rogers Weinshenker</u>" (Tr. 1 (emphasis added)). In that notice, the Appeals Council provided the following description of the materials it considered:

> In looking at your case, we considered the reasons you disagree with the decision in the material listed on the enclosed Order of Appeals Council [referencing Claimant's attorney's brief dated October 8, 2015 (Tr. 6, 400-05)].

> We found that this information does not provide a basis for changing the [ALJ's] decision.
>
> <u>We also looked at treatment records from</u> CHS Harrisburg, dated February 2, 2015 (2 pages) and <u>CMC Northeast, dated July 5, 2015 (29 pages)</u>, and opinions from Sally Rogers, LCAS, dated December 9, 2014 (1 page) and Benjamin Kunsesh, M.D., dated December 11, 2014. <u>The [ALJ] decided your case through December 31, 2013, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits</u>.

(Tr. 2 (emphasis added).) The Appeals Council did not incorporate Claimant's new evidence into the record as an exhibit (<u>see</u> Tr. 5, 6, 34-70), and its denial of Claimant's request for review rendered the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

Claimant's attorney then instituted the instant action, listing as "Plaintiff" in the case caption "Seth Weinshenker [Claimant's spouse] for Melissa Weinshenker (Deceased)" (Docket Entry 1 at 1), and in the Complaint, Claimant's attorney referred to both Melissa Weinshenker and Seth Weinshenker as "Plaintiff" (<u>see, e.g.</u>, <u>id.</u>, ¶ 2). In the brief supporting Plaintiff's Motion for a Judgment Reversing or Modifying the Decision of the Commissioner of Social Security, or Remanding the Cause for a Rehearing, Claimant's attorney maintained that Claimant's "<u>husband was substituted</u> and again appealed to the [Appeals Council]" on August 12, 2105 (Docket Entry 9 at 3 (referencing Tr. 31) (emphasis added)); however, in the Complaint, Claimant's attorney indicated

that, "on the 4th day of November, 2016[,] a subsequent denial of [] Plaintiff's (decedent's) request for review was issued by the Appeals Council." (Docket Entry 1, ¶ 2 (emphasis added).)

## II.  DISCUSSION

### A.  Standing

Defendant moves for dismissal of the Complaint on the grounds that Plaintiff lacks Article III constitutional standing to pursue Claimant's application for DIB in this Court. (See Docket Entry 11 at 3-8; see also Docket Entry 13.)  According to Defendant, the Act 'provides a framework for the right to appeal 'any final decision of the [Commissioner] made *after a hearing to which he was a party*' and 'obtain a review of such decision' within the established time in [f]ederal court." (Docket Entry 11 at 4 (emphasis by Defendant) (quoting 42 U.S.C. § 405(g)).)  Defendant points out that "[t]he Act and corresponding regulations define a hierarchy of individuals who can collect underpaid DIB owed to a deceased claimant '*who is determined by the Commissioner*' [to be eligible]." (Id. (emphasis by Defendant) (quoting 42 U.S.C. § 404(d) and citing 20 C.F.R. § 404.503(b)).)  In that regard, Defendant notes that, if the Appeals Council receives notice that a claimant has died during the pendency of his or her request for review, the regulations "'*require the [Appeals Council] to determine whether there are persons who could be [substitute] parties in [the] case*.'" (Id. at 5 (emphasis by Defendant) (quoting

Program Operations Manual System (POMS) DI 12045.050 and citing 20 C.F.R. § 404.971 (providing that "[t]he Appeals Council will dismiss [a claimant's] request for review if . . . [the claimant] or any other party to the proceedings dies and the record clearly shows that dismissal will not adversely affect any other person who wishes to continue the action").) Defendant argues that "[n]either [Plaintiff] nor [Claimant's] attorney [] can just unilaterally declare that '[Claimant's] husband was substituted' (id. at 7 (quoting Docket Entry 9 at 3)) and that, "[c]ontrary to [Claimant's] attorney['s] assertion of substitution, there is no evidence in the transcript that any request was ever made of the [Social Security Administration], not by [Claimant's] attorney [], not by [Plaintiff], and not by any other person, to allow [Plaintiff] to be a substitute party" (Docket Entry 11 at 3-4 (citing Tr. 1-790)).[2]

"The power of federal courts to entertain suits is circumscribed by Article III of the United States Constitution, which limits judicial authority to 'Cases' and 'Controversies.'" Bishop v. Bartlett, 575 F.3d 419, 423 (4th Cir. 2009) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992) and

---

[2] Defendant, however, has not identified (and independent research has not revealed) any authority requiring the filing of any such request. To the contrary, the administrative materials cited by Defendant (and quoted above) indicate that the Appeals Council must take steps to determine if any person possesses an interest in the claim of a claimant who dies during the final phase of administrative process, particularly when (as here)_ the Appeals Council receives notice of the claimant's death (as, in this case, via submission of records documenting the claimant's death).

Warth v. Seldin, 422 U.S. 490, 498 (1975)). "The standing doctrine has both constitutional and prudential components." Id. (citing Allen v. Wright, 468 U.S. 737, 751 (1984)). "[T]he party invoking federal jurisdiction bears the burden of establishing its existence," id. at 104, and "[s]tanding cannot . . . be inferred from averments in the pleadings, but rather must affirmatively appear in the record; and naked assertions devoid of further factual enhancement will not suffice," Blanton ex rel Blanton v. Astrue, No. 1:10-cv-2463, 2011 WL 2637224, at *2-3 (N.D. Ohio June 20, 2011) (unpublished), recommendation adopted, 2011 WL 2637248 (N.D. Ohio July 6, 2011) (unpublished).

**1. Article III Constitutional Standing**

"Article III [constitutional] standing is an issue of subject matter jurisdiction, which relates to the power of this Court to hear a case." Keith Bunch Assocs., LLC v. La-Z-Boy Inc., No. 1:14-cv-850, 2015 WL 4158760, at *4 (M.D.N.C. July 9, 2015) (unpublished) (Biggs, J.) (citing Beyond Systems, Inc. V. Kraft Foods, Inc., 777 F.3d 712, 715-16 (4th Cir. 2015)). "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998) (quoting Mansfield, C. & L.M. Ry. Co. v. Swan, 111 U.S. 379, 382 (1884)). To have constitutional standing, a plaintiff must have

suffered a "concrete and actual or imminent" harm, "a fairly traceable connection" must exist "between the plaintiff's injury and the complained-of conduct of the defendant[,]" and the plaintiff must show the requested relief would likely redress the harm.  Id. at 103 (internal quotation marks and citations omitted).  "The question of [constitutional] standing is not subject to waiver, . . . [as] [t]he federal courts are under an independent obligation to examine their own jurisdiction."  United States v. Hays, 515 U.S. 737, 742 (1995).

Section 405(g) empowers an individual to seek judicial review in federal district court of a "final decision of the Commissioner . . . made after a hearing to which he [or she] was a party."  42 U.S.C. § 405(g) (emphasis added).  As discussed above, Defendant maintains that, pursuant to Section 405(g), Plaintiff's failure to substitute himself as a party while Claimant's case remained pending before the Appeals Council renders him without Article III constitutional standing to pursue Claimant's application for DIB in this Court.  For the following reasons, Defendant's argument unreasonably construes Section 405(g), and the Court should find that Plaintiff possesses Article III standing.

Defendant correctly asserts that the record neither reflects that Plaintiff or Claimant's attorney submitted a request to the Appeals Council to designate Plaintiff as a substitute party to pursue Claimant's application for DIB, nor that the Appeals Council

allowed Plaintiff to proceed as a substitute party. (See Docket Entry 11 at 3-4 (citing Tr. 1-790).) However, the language of Section 405(g) does not mandate a particular substitution procedure when a claimant's death occurs after the ALJ's hearing (and unfavorable decision) but before issuance of the Appeals Council's order on the request for review. See 42 U.S.C. 405(g). Because Claimant died after the ALJ's hearing, even had Plaintiff (or anyone else) requested (and obtained) substitution as a party, under Defendant's reading of Section 405(g), that post-hearing substitution still would result in the denial of standing. See id. (enabling judicial review of a "final decision of the Commissioner . . . made after a hearing to which he was a party" (emphasis added).[3]

Defendant's citation of multiple cases where substitution occurred while the deceased claimant's application for benefits remained pending before the Appeals Council (and therefore the individual did not qualify as a party at the time of the ALJ's hearing), but neither the Commissioner nor the courts involved took

---

[3] Because the Appeals Council reviews the ALJ's decision and does not take new testimony, Section 405(g)'s use of the term "hearing" does not facially apply to proceedings before the Appeals Council. In that same vein, Plaintiff argues that the Social Security Administration's Notice Regarding Substitution of Party Upon Death of Claimant form, which Defendant maintains Plaintiff should have used to substitute himself as a party for Claimant (see Docket Entry 13 at 4 & n.1), "pertains only to the decedent's request for [a] hearing" and "does not state that the form is required after the ALJ has rendered a decision." (Docket Entry 12 at 3 (referencing Docket Entry 12-2).) Indeed, the form expressly authorizes an individual only to request substitution when a claimant "ha[s] requested a hearing but died before action on the request was completed." (Docket Entry 12-2 at 1.)

the position that the substituted party lacked standing under Section 405(g) (see Docket Entry 11 at 6-7 & n.5 (citing cases)), underscores that, for purposes of Section 405(g), Article III standing may exist for individuals who did not literally participate as parties at the time of the hearing referenced in Section 405(g). The question then becomes who may pursue a claim when, as here, the claimant dies after an administrative hearing, but before final administrative action.[4]

In that regard, the Court should conclude that Plaintiff possesses Article III constitutional standing by virtue of his interest under 42 U.S.C. § 404(d). That statute governs "[p]ayment to survivors or heirs when eligible person is deceased," and accords the highest priority to the deceased's surviving spouse, as follows:

> if an individual dies before any payment due him [or her] . . . is completed, payment of the amount due . . . shall be made--
>
> > (1) to the person, if any, who is determined by the Commissioner . . . to be the surviving spouse of the deceased individual and who either (i) was living in the same household with the deceased at the time of his [or her] death or (ii) was, for the month in which the deceased individual died, entitle to a monthly

_____

[4] Nor do the statutes, regulations, and other agency provisions governing the Appeals Council's options and obligations regarding a pending request for review upon the death of a claimant and the hierarchy of individuals who can pursue a deceased Claimant's underpaid DIB contain any provision as to the procedure an individual must follow to continue pursuit of a claim when a claimant dies following a hearing before an ALJ. See 42 U.S.C. § 404(d); 20 C.F.R. §§ 404.503, 404.971; Hearings, Appeals, and Litigation Law (HALLEX) Manual I-3-4-4A.1.a; POMS DI 12045.050.

> benefit on the basis of the same wages and
> self-employment income as was the deceased
> individual.

42 U.S.C. § 404(d); see also 20 C.F.R. § 404.503(b) (setting forth

same hierarchy of eligible substitute parties).  Here, the record

demonstrates that Plaintiff and Claimant lived together as husband

and wife at the time of Claimant's death.  (See Tr. 31, 47, 109.)

Thus, Section 404(d)(1) confers upon Plaintiff an interest

sufficient to provide Article III standing in connection with

Claimant's application for DIB.  See Iannaccone v. Law, 142 F.3d

553, 559 (2d Cir. 1998) (holding that, "as the sole surviving child

of the deceased beneficiary, [the plaintiff] has the statutory

right to proceed pro se with his underpayment claim against the

Commissioner" in a case "brought originally before the Commissioner

by [the] plaintiff pursuant to 42 U.S.C. § 404(d) for underpayment

of social security benefits that were due his deceased father");

Youghiogheny & Ohio Coal Co. v. Webb, 49 F.3d 244, 247 (6th Cir.

1995) (declaring that "[a] member of any of the enumerated classes

[of individuals eligible under Section 404(d)] has standing to

pursue the deceased beneficiary's benefits").

In contrast, the cases where a court found a lack of Article

III standing generally involved individuals who, based on the

record before the court, did not clearly have the highest priority

under Section 404(d).  See, e.g., Estate of Currier v. Astrue, No.

10-14355, 2012 WL 4358199, at *2 (E.D. Mich. June 18, 2012)

(unpublished) (granting the defendant's motion to dismiss complaint for lack of standing where, <u>even after decedent's brother "filed to substitute himself as a party"</u> while the case remained before the ALJ, he did not "show that he ha[d] the highest priority to receive [decedent's] [DIB] under 42 U.S.C. § 404(d)" (emphasis added)); <u>Blanton</u>, 2011 WL 2637224, at *2-3 (finding decedent's mother lacked standing to pursue decedent's DIB claim because decedent's children had priority over mother under 42 U.S.C. § 404(d)); <u>Webb v. Commissioner of Soc. Sec.</u>, No. 08-CV-0082, 2009 WL 3719398, at *3 (N.D.N.Y. Nov. 4, 2009) (unpublished) (dismissing complaint and finding decedent's stepbrother lacked standing to pursue decedent's DIB claim because stepbrother did not "allege that he [wa]s an . . . estate representative and that there [we]re no other beneficiaries or creditors of [decedent's] estate").

In short, the Court should find that Plaintiff possesses Article III standing to seek relief regarding Claimant's DIB application.

**2. Prudential Standing**

"With regard to the prudential component of standing, courts generally recognize three self-imposed constraints." <u>Bishop</u>, 575 F.3d at 423 (citing <u>Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 474-75 (1982), and <u>Allen</u>, 468 U.S. at 751):

> First, "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all

13

or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." <u>Warth</u>, 422 U.S. at 499; <u>see, e.g.</u>, <u>United States v. Richardson</u>, 418 U.S. 166 (1974). Second, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." <u>Warth</u>, 422 U.S. at 499; <u>accord</u> <u>Valley Forge</u>, 454 U.S. at 474. Third, "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." <u>Bennett v. Spear</u>, 520 U.S. 154, 162 (1997); <u>see, e.g.</u>, <u>Ass[ociatio]n of Data Processing Serv. Orgs., Inc. v. Camp</u>, 397 U.S. 150, 153.

<u>Bishop</u>, 575 F.3d at 423 (parallel citations omitted).

Unlike constitutional standing, "[t]he circuits are divided regarding whether a court's consideration of prudential standing is permissive or mandatory when the parties have failed to properly raise the issue." <u>In re: Stanworth</u>, 543 B.R. 760, 770 (Bankr. E.D. Va. 2016); <u>compare, e.g.</u>, <u>Association of Battery Recyclers, Inc. v. EPA</u>, 716 F.3d 667, 674 (D.C. Cir. 2013) (noting that "this Circuit treats prudential standing as 'a jurisdictional issue which cannot be waived or conceded'" (quoting <u>Animal Legal Def. Fund, Inc. v. Espy</u>, 29 F.3d 720, 723 n.2 (D.C. Cir. 1994))), <u>with, e.g.</u>, <u>Rawoof v. Texor Petroleum Co.</u>, 521 F.3d 750, 757 (7th Cir. 2008) (indicating that "the court may raise an unpreserved prudential-standing question on its own, but unlike questions of constitutional standing, it is not obliged to do so").

Although the United States Court of Appeals for the Fourth Circuit has not directly addressed whether a party waives the issue of prudential standing by failing to properly raise it, that court

has held that, "[u]nlike Article III standing, issues of prudential standing are <u>non-jurisdictional</u> and may be pretermitted in favor of a straightforward disposition on the merits," <u>United States v. Day</u>, 700 F.3d 713, 721 (4th Cir. 2012) (emphasis added).  Because Defendant did not preserve any prudential standing challenge in its Answer (<u>see</u> Docket Entry 5), and did not develop any prudential standing challenge in connection with its Motion to Dismiss (<u>see</u> Docket Entry 11), the Court should deem the issue waived and proceed to a determination of the merits.

## B. <u>Merits</u>

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."  <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited."  <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## 1. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted).  "Substantial

evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[5]  "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition."  <u>Id.</u>  "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled."  <u>Id.</u>

This sequential evaluation process ("SEP") has up to five steps:  "The claimant (1) must not be engaged in 'substantial gainful activity,' <i>i.e.</i>, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of

---

[5]  The Act "comprises two disability benefits programs.  [DIB] provides benefits to disabled persons who have contributed to the program while employed.  The Supplemental Security Income Program provides benefits to indigent disabled persons.  The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical."  <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[6] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[7] Step four then requires the ALJ to assess

---

[6] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[7] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658
(continued...)

whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[8]

## 2. Assignments of Error

Plaintiff contends that the Court should overturn the ALJ's finding of no disability on these grounds:

(1) "the ALJ reject[ed] the opinions of [Claimant's] treating physician without giving good reasons for doing so" (Docket Entry 9 at 3 (bold font omitted));

---

[7] (...continued)
F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[8] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

(2) "the ALJ d[id] not give a complete function-by-function analysis of the nonexertional mental functions associated with [Claimant's] difficulties in the broad areas of functioning and d[id] not make a complete finding as to [Claimant's] mental [RFC]" (id. at 8 (bold font omitted)); and

(3) "[t]he ALJ sa[id] he gave great weight to the [s]tate agency psychological consultants' opinions[,] but he omitted some of their opined limitations from the [RFC] without an explanation" (id. at 15 (internal citation omitted)).[9]

a. Treating Psychiatrist's Opinion

In Plaintiff's first issue on review, he maintains that the ALJ rejected the opinion of treating psychiatrist Dr. J.W. Scott Wallace "making only a conclusory statement that the progress notes and medical evidence d[id] not support the limits opined by Dr. Wallace," and without stating "how much weight [the ALJ] actually afforded Dr. Wallace's opinions" or "identify[ing] with any specificity evidence in the record to support th[at] conclusory statement." (Id. at 4.) Plaintiff additionally faults the ALJ for referencing Dr. Wallace's comment that Claimant was "doing well," arguing that "[c]ourts have held as a matter of law that the phrase 'doing well' or is 'stable'" does not support rejection of a medical opinion "if the [progress] notes show that the claimant is

---

[9] In light of the recommendation to deny Plaintiff's assignments of error on the merits, no need exists for the Court to request (and consider) a cross-motion for judgment and supporting memorandum from Defendant.

only doing well relative to a prior, poor state." (Id. at 5 (citing Kellough v. Heckler, 785 F.2d 1147, 1153 (4th Cir. 1986) (finding that "isolated references in the physician's notes to 'feeling well' and 'normal activity' are not a substantial basis for rejecting as incredible the claimant's subjective complaints of exertional limitation").) Plaintiff deems the ALJ's error with regard to Dr. Wallace's opinion harmful, "as the ALJ rejected, without stating how much weight was given to, the only opinion from a treating psychiatrist of [Claimant's] ability to stay on task and to maintain regular attendance." (Id. at 6.) Plaintiff's contentions warrant no relief.

The treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment. See 20 C.F.R. § 404.1527(c)(2) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). However, the rule also recognizes that not all treating sources or treating source opinions merit the same deference. The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords an opinion. See 20 C.F.R. § 404.1527(c)(2)(ii).

Moreover, as subsections (2) through (4) of the rule describe in great detail, a treating source's opinion, like all medical opinions, deserves deference <u>only</u> if well-supported by medical signs and laboratory findings <u>and</u> consistent with the other substantial evidence in the case record. <u>See</u> 20 C.F.R. § 404.1527(c)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence <u>or</u> if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." <u>Craig</u>, 76 F.3d at 590 (emphasis added).

In this case, on July 16, 2012, Dr. Wallace completed a "Mental [RFC] Questionnaire" ("MRFC") (Tr. 616-20), on which he indicated that he had treated Claimant for about seven months with variable frequency (<u>see</u> Tr. 616). Dr. Wallace diagnosed Claimant with depressive disorder (no other specification), bipolar II disorder, and cluster B personality traits, and indicated that Claimant had shown "fair to good response" to medication and psychotherapy, and experienced no side effects from her medications. (<u>Id.</u>) Dr. Wallace further opined that Claimant was "currently doing well," that "most [of her] problems [we]re somatic in nature," and rated her prognosis as "fair to good." (<u>Id.</u>) Dr. Wallace indicated that he could not assess Claimant's mental abilities and aptitudes to do unskilled, semi-skilled or skilled work (<u>see</u> Tr. 618-19), but felt that Claimant's mental impairments would cause her absence from work about two days per month (<u>see</u> Tr.

620).  On May 20, 2013, Dr. Wallace signed and dated a letter Claimant's attorney sent to him, indicating his agreement with the statement that, "the combination of the conditions for which [Dr. Wallace] was treating [Claimant] . . . would interfere with and/or limit her functioning at least 10% of the time over the course of an eight-hour workday."  (Tr. 615.)

Here, the ALJ's evaluation of Dr. Wallace's opinions complied with the regulatory requirements.  The ALJ assessed Dr. Wallace's opinions as follows:

> J. W. Scott Wallace, M.D[.] completed a[n] [MRFC] on July 16, 2012, indicating that [Claimant's] medications "could cause side-effects of dizziness, drowsiness, and stomach upset" but progress notes do not show that she indicated any of these side effects.  Dr. Wallace indicated that [Claimant] was currently doing well and that most of her problems were somatic in nature.  Her prognosis was fair to good.  [Claimant's] signs and symptoms included decreased energy, feelings of guilt or worthlessness, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, emotional withdrawal or isolation, emotional lability, flight of ideas, and easy distractibility.  Dr. Wallace was unable to assess [Claimant's] mental abilities and aptitudes needed to do unskilled, semi-skilled or skilled work.  Dr. Wallace indicated that [Claimant's] psychiatric condition increased the signs or other psychiatric symptoms and could increase pain.  Dr. Wallace indicated that [Claimant] would be absent about two days per month from work and that her impairments had lasted or could be expected to last at least twelve months.
>
> On May 20, 2013, Dr. Wallace[] signed a statement indicating that due to the combination of the conditions for which he was treating [Claimant], namely major depressive disorder, generalized anxiety disorder, cluster B personality traits, and fibromyalgia, these conditions would interfere with and/or limit her functioning at least ten percent of the time over the course of an eight-hour workday.  I have considered the

23

> opinions of Dr. Wallace but note that []he[] was unable
> to assess [Claimant's] mental abilities and aptitudes
> needed to do unskilled, semi-skilled or skilled work.
> Dr. Wallace did indicate that [Claimant] was "doing
> well." I do not find that the statements and opinions
> from Dr. Wallace essentially indicated that [Claimant] is
> disabled from all work activity and <u>I do not find that</u>
> <u>the progress notes and medical evidence of record</u>
> <u>supports the limits in functioning as outlined by Dr.</u>
> <u>Wallace</u>.

(Tr. 19-20 (internal citations omitted) (emphasis added).)

Plaintiff's argument that the ALJ erred by not expressly indicating the weight he afforded to Dr. Wallace's opinions misses the mark. As Dr. Wallace declined to provide an assessment of Claimant's ability to perform mental work-related abilities (see Tr. 618-19), his opinions regarding Claimant's predicted absenteeism and time off-task constitute the only significant remaining opinions. The ALJ expressly discussed both of those opinions, but noted that "the progress notes and medical evidence of record [did not] support[] the limits in functioning as outlined by Dr. Wallace." (Tr. 20.) The ALJ did not incorporate Dr. Wallace's opinions regarding Claimant's absenteeism or time off-task in either the RFC (see Tr. 15) or his hypothetical question to the ALJ (see Tr. 139). Moreover, the ALJ expressly acknowledged the VE's testimony that an individual who would miss work two days per month and/or remain off-task for ten percent of the workday could not maintain competitive employment (see Tr. 22 (referencing Tr. 142)), but again stated that "the medical evidence of record does not support the degree and severity of the limitations

24

outlined by Dr. Wallace" (Tr. 22). Thus, the ALJ's decision makes clear that he did not assign any weight to Dr. Wallace's opinions regarding Plaintiff's absenteeism and time off-task.

Moreover, Plaintiff's citation to <u>Kellough</u> (Docket Entry 9 at 5) does not require relief. That decision merely counsels that a physician's notation that a patient "'feels well' . . . <u>must be read in context</u>." <u>Kellough</u>, 785 F.2d at 1153 (emphasis added). In <u>Kellough</u>, the physician's comment that the plaintiff "feels well" occurred just one month before she underwent open heart surgery. <u>Id.</u> Here, however, Dr. Wallace's opinion that Claimant was "currently doing well" (Tr. 616) occurred in the context of an assessment Dr. Wallace provided of Claimant's overall mental functioning, in which he also opined that Claimant primarily experienced somatic problems, that she showed "fair to good response" to medication and psychotherapy, and enjoyed a "fair to good" prognosis (<u>see</u> <u>id.</u>). Thus, <u>Kellough</u> presents no barrier to the ALJ's consideration of Dr. Wallace's observation that Claimant was "currently doing well."

In sum, the ALJ did not err in his evaluation of Dr. Wallace's opinions.

b. Mental RFC

Next, Plaintiff contends that "the ALJ d[id] not give a complete function-by-function analysis of the nonexertional mental functions associated with [Claimant's] difficulties in the broad

areas of functioning" (Docket Entry 9 at 8 (bold font omitted)), in violation of Social Security Ruling 96-8p, <u>Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims</u>, 1996 WL 374184 (July 2, 1996) ("SSR 96-8p"), and <u>Mascio v. Colvin</u>, 780 F.3d 632 (4th Cir. 2015) (<u>see</u> Docket Entry 9 at 8-15). In particular, Plaintiff attacks the sufficiency of the mental RFC in three respects: the ALJ (1) did not account for Claimant's moderate deficit in concentration, persistence or pace ("CPP") or "make a finding as to [her] ability to stay on task" (<u>id.</u> at 10 (bold font omitted)); (2) failed to "provide the required detailed assessment of the effect of [Claimant's] difficulties in social functioning on her ability to engage in sustained work activities" (<u>id.</u> at 12 (bold font omitted)); and (3) neglected to "provide an explanation of the effect of [Claimant's] restrictions in activities of daily living on her ability to engage in work activity" (<u>id.</u> at 13 (bold font omitted)). Plaintiff's contentions fail as a matter of law.

At steps two and three of the SEP, the ALJ must assess the degree of functional limitation resulting from Claimant's mental impairments pursuant to criteria in the corresponding mental disorders in the listing of impairments. <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00; 20 C.F.R. § 404.1520a(b)(2) & (c)(2). As relevant to the instant case, paragraphs B of Listings 12.04 ("Affective [D]isorders") and 12.07 ("Somatoform [D]isorders") each

contain four broad functional areas: 1) activities of daily living;
2) social functioning; 3) concentration, persistence, or pace; and
4) episodes of decompensation. <u>See</u> 20 C.F.R. Pt. 404, Subpt. P,
App'x 1, §§ 12.04B & 12.07B; <u>see also</u> 20 C.F.R. § 404.1520a(c)(3).
The ALJ's decision must include a specific finding of the degree of
limitation in each of those functional areas. 20 C.F.R.
§ 404.1520a(e)(4). However, the paragraph B criteria limitations
<u>do not constitute an RFC assessment</u>. SSR 96-8p, 1996 WL 374184, at
*4 (emphasis added). Rather, the ALJ considered those matters for
purposes of evaluating the severity of Claimant's mental
impairments at steps two and three of the SEP. <u>Id.</u>

     "The mental RFC assessment used at steps 4 and 5 of the [SEP]
requires a more detailed assessment by itemizing various functions
contained in the broad categories found in paragraphs B and C,"
<u>id.</u>, and includes consideration of Claimant's "abilities to:
understand, carry out, and remember instructions; use judgment in
making work-related decisions; respond appropriately to
supervision, co-workers and work situations; and deal with changes
in a routine work setting," <u>id.</u> at *6. Thus, the regulations do
not require the ALJ to incorporate word-for-word the matters noted
in evaluating the severity of mental impairments into either the
RFC or any hypothetical question. <u>See</u> <u>Yoho v. Commissioner of Soc.</u>
<u>Sec.</u>, No. 98-1684, 1998 WL 911719, at *3 (4th Cir. Dec. 31, 1998)
(unpublished) (holding ALJ has no obligation to transfer paragraph

B findings verbatim to hypothetical question(s)); <u>accord</u> <u>Patterson</u> <u>v. Astrue</u>, No. 1:08-CV-109-C, 2009 WL 3110205, at *5 (N.D. Tex. Sept. 29, 2009) (unpublished).

i. CPP

As to the specific challenges raised by Plaintiff, he first maintains that the ALJ failed to account for Claimant's moderate deficits in CPP in the mental RFC determination. (<u>See</u> Docket Entry 9 at 10-12 (referencing Tr. 15-21).) In that regard, Plaintiff argues that, pursuant to <u>Mascio</u>, "'an ALJ does not account for a claimant's limitations in [CPP] by restricting the hypothetical question to simple, routine tasks or unskilled work . . . [because] the ability to perform simple tasks differs from the ability to stay on task[,] [and] [o]nly the latter limitation would account for a claimant's limitation in [CPP].'" (<u>Id.</u> at 11 (quoting <u>Mascio</u>, 780 F.3d at 638 (internal quotation marks omitted)).) According to Plaintiff, the ALJ's finding that Claimant remained capable of performing "simple, routine, repetitive, unskilled tasks" (Tr. 15) neither addressed Claimant's ability to stay on task, nor her "ability to perform them for a full workday." (<u>Id.</u> (citing <u>Mascio</u>, 780 F.3d at 637).) Plaintiff's argument falls short.

The United States Court of Appeals for the Fourth Circuit has held that "the ability to perform simple tasks differs from the ability to stay on task" and that "[o]nly the latter limitation

would account for a claimant's limitation in [CPP]." Mascio, 780
F.3d at 638. However, as a neighboring district court has
explained:

> Mascio does not broadly dictate that a claimant's
> moderate impairment in concentration, persistence, or
> pace always translates into a limitation in the RFC.
> Rather, Mascio underscores the ALJ's duty to adequately
> review the evidence and explain the decision . . . . An
> ALJ may account for a claimant's limitation with
> concentration, persistence, or pace by restricting the
> claimant to simple, routine, unskilled work where the
> record supports this conclusion, either through physician
> testimony, medical source statements, consultative
> examinations, or other evidence that is sufficiently
> evident to the reviewing court.

Jones v. Colvin, No. 7:14CV00273, 2015 WL 5056784, at *10-12 (W.D.
Va. Aug. 20, 2015) (Magistrate Judge's Report & Recommendation
adopted by District Judge) (unpublished) (emphasis added). Here,
the ALJ's decision provides a sufficient explanation as to why
limitations in the RFC to "simple, routine, repetitive, unskilled
tasks" (Tr. 15) sufficiently accounted for Claimant's moderate
limitation in CPP.

First, the ALJ discussed Claimant's statements and testimony
regarding her mental symptoms (see Tr. 16, 19), but concluded that
"[C]laimant's statements concerning the intensity, persistence and
limiting effects of [her] symptoms [we]re not entirely credible"
(Tr. 16), and that "[t]he objective medical evidence weakens the
credibility of [] [C]laimant's allegations" (Tr. 21). Plaintiff
does not directly challenge the ALJ's evaluation of Claimant's
subjective complaints. (See Docket Entry 9.)

Second, the ALJ summarized Claimant's mental health treatment (see Tr. 17-18), and noted that mental status examinations showed that Claimant's "[t]houghts were linear and goal directed without flight of ideas or loose associations," that Claimant "was alert and completely oriented," and that her "attention and concentration w[ere] intact." (Tr. 18; see also Tr. 21 ("[M]ental status examinations have shown [] [C]laimant alert and oriented with good attention, concentration and memory").) Plaintiff does not challenge the ALJ's summarization of Claimant's mental health treatment history. (See Docket Entry 9.)

Third, the ALJ also discussed and weighed the opinion evidence as it related to Claimant's ability to function mentally. (See Tr. 19-21.) Notably, the ALJ gave "great weight" to the state agency psychological consultants' opinions that, despite moderate deficit in CPP (see Tr. 153, 166), Claimant remained "able to maintain attention/concentration in order to perform [simple, routine, repetitive tasks]" (Tr. 156, 170 (emphasis added)). (Tr. 20.) The ALJ's crediting of the state agency psychological consultants' conclusions that Claimant remained able to maintain attention and concentration to complete simple, routine, repetitive tasks provides "an accurate and logical bridge," Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000), between the evidence and the ALJ's findings, see Able v. Colvin, No. 1:14CV1078, 2016 WL 1229086, at *5 (M.D.N.C. Mar. 28, 2016) (unpublished) (Osteen, C.J.) (holding

30

ALJ "adequately explained" why limitation to simple tasks encompassed moderate deficit in CPP where ALJ gave "significant weight" to state agency consultant's opinion that, despite such deficit, the claimant could sustain attention and concentration for simple tasks).

Under these circumstances, the ALJ adequately explained why limitations to "simple, routine, repetitive, unskilled tasks" (Tr. 15) sufficiently accounted for Claimant's moderate limitation in CPP.

ii. Social Functioning

Plaintiff faults the ALJ's decision-making with respect to Claimant's ability to function socially in two respects: (1) the ALJ failed to explain what he meant by limiting Claimant to "'occasional contact'" with supervisors, coworkers, and the general public (Docket Entry 9 at 12 (quoting Tr. 15)); and (2) the ALJ made "no determination as to how [Claimant] would be able to accept instructions, criticism, etc. from her supervisors" (id. at 13 (quoting Tr. )).  Those arguments fail.

Plaintiff has not shown why the term "contact" warrants explanation beyond its common, every day meaning.  (See Docket Entry 9 at 12-13.)  Nor does it appear he could.  See Frye v. Berryhill, No. 1:16CV543, 2017 WL 3242259, at *5 (M.D.N.C. July 28, 2017) (unpublished) (Peake, M.J.) (rejecting argument "contact" required additional definition by ALJ); O'Brien v. Colvin, No.

1:15CV536, 2016 WL 2755459, at *5 (M.D.N.C. May 11, 2016) (unpublished) (Auld, M.J.) (concluding term "contact" did not warrant further explanation by ALJ), recommendation adopted, 2016 WL 5660296 (M.D.N.C. Sept. 30, 2016) (Tilley, Jr., S.J.); see also Campos v. Astrue, No. CV 10-8603 AGR, 2012 WL 467985, at *2 (C.D. Cal. Feb. 14, 2012) (unpublished) (finding phrase "limited contact with the general public . . . reasonably compatible with a job that does not focus on working with people").

Even more significantly, the VE did not express any difficulty in understanding the meaning of the ALJ's hypothetical (see Tr. 139-42), and Plaintiff's (then Claimant's) counsel, despite an opportunity for cross-examination, declined to question the VE regarding the meaning of the term "contact" or whether the jobs cited by the VE accommodated occasional contact with supervisors, coworkers, and the general public (see Tr. 142-45). That consideration also forecloses relief. See generally Pierson v. Commissioner of Soc. Sec., No. 1:12-cv-126, 2013 WL 428751, at *7 (S.D. Ohio Feb. 1, 2013) (unpublished) (holding that, "despite the purported vagueness of the term [superficial], any error would be harmless as the VE was able to understand the term and testified that there were jobs in the local and national economy that [the] plaintiff could perform"), recommendation adopted, 2013 WL 791875 (S.D. Ohio Mar. 4, 2013) (unpublished).

Plaintiff additionally asserts error arising out of the ALJ's failure to include in the RFC any "determination as to how [Claimant] will be able to accept instructions, criticism, etc. from her supervisors." (Docket Entry 9 at 13.) First, the ALJ adequately addressed Claimant's limitations interacting with supervisors by restricting her to only occasional contact with such individuals. (<u>See</u> Tr. 15.) Moreover, the ALJ gave "great weight" to the opinions of state agency psychological consultants (Tr. 20), who concluded that, despite "[m]oderate[] limit[ation]" in "[t]he ability to accept instructions and respond appropriately to criticism from supervisors," Claimant remained capable of performing work "in settings with no demand for extensive social interactions." (Tr. 156, 170.)

Simply put, the Court can meaningfully review the ALJ's decision-making with regard to Claimant's social functioning.

iii. Activities of Daily Living

Plaintiff contends that the ALJ did "not discuss what effect, if any, [Claimant's] [mild] restrictions in activities of daily living have on her ability to engage in work activity on a sustained basis." (Docket Entry 9 at 13.) According to Plaintiff, "[i]f there is no effect on the [RFC] due to the restrictions in [activities of daily living,] the ALJ needs to explain how he reached that conclusion and identify the evidence that supports that conclusion and identify the evidence that supports this

conclusion." (Id. at 14-15 (citing Mascio, 780 F.3d at 636, and Patterson v. Commissioner of Soc. Sec., 846 F.3d 656, 663 (4th Cir. 2017) (admonishing ALJs to "[s]how [their] work").)  Plaintiff's contention warrants no relief.

Some district courts within the Fourth Circuit have extended the holding in Mascio to require an ALJ to either include restrictions in the RFC arising out of mild limitations in the broad areas of functioning or justify the omission of such restrictions.  See, e.g., Ashcraft v. Colvin, No. 3:13CV00417RLVDCK, 2015 WL 9304561, at *9 (W.D.N.C. Dec. 21, 2015) (unpublished) ("[S]ince Mascio was decided, the majority of other courts in North Carolina have similarly found that, where an ALJ determines that a claimant suffers from 'mild' or 'moderate' limitations in his or her activities of daily living, social functioning, and ability to maintain [CPP] and such limitations are unaccounted for in the RFC, or their absence is unexplained in the analysis surrounding the ALJ's RFC determination, remand is required."); Reinhardt v. Colvin, No. 3:14-CV-00488-MOC, 2015 WL 1756480, at *3 (W.D.N.C. Apr. 17, 2015) (unpublished) ("While the court agrees with the Commissioner's argument that the fact that the ALJ found mild limitations in the paragraph B criteria does not necessarily translate to a work-related functional limitation, Mascio clearly imposes on the Commissioner a duty to explain why such mild mental health impairments found at step two do not

translate into work-related limitations when [the] plaintiff's RFC for work is considered."). Assuming that _Mascio_ applies even in the context of _mild_ limitations in the broad areas of functioning (i.e., the lowest of four levels above "none"), the ALJ here sufficiently explained why Plaintiff's mild limitations in daily activities did not translate into further restrictions in the RFC.

As an initial matter, Plaintiff neither disputes the ALJ's finding of only mild limitation in daily activities (_see_ Tr. 14) and description of Claimant's reported daily activities (_see_ Tr. 14, 18, 19, 21), nor makes any attempt to show how a mild limitation in daily activities should have further impacted the ALJ's RFC (_see_ Docket Entry 9 at 13-15). Further, the ALJ gave "great weight" to the opinion of the state agency psychological consultants (Tr. 20), who each concluded that Claimant remained "capable of [simple, routine, repetitive tasks]" (Tr. 157, 170), despite _mild_ limitation in the ability to perform daily activities (_see_ Tr. 153, 166). The ALJ's analysis thus provides "an accurate and logical bridge," _Clifford_, 227 F.3d at 872, between the finding of mild deficits in daily activities and the mental RFC determination.

In conclusion, the ALJ complied with _Mascio_ and supported his mental RFC determination with substantial evidence.

c.  State Agency Psychological Consultants' Opinions

Finally, Plaintiff asserts that "[t]he ALJ sa[id] he gave great weight to the [s]tate agency psychological consultants' opinions[,] but he omitted some of their opined limitations from the [RFC] without an explanation." (Docket Entry 9 at 15 (internal citation omitted)).  More specifically, Plaintiff points out that "[b]oth psychological consultants opined that [Claimant] was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors" (id. at 15), and "was moderately impaired in her ability to respond appropriately to changes in the work setting" (id. at 16), but "the ALJ d[id] not make a finding nor explain how he reconciled those opinions with the [RFC]" (id.).  Plaintiff urges that prejudice resulted from that error, because "the ability to accept instructions and respond appropriately to criticism from supervisors" and the "ability to respond to changes in the work setting" constitute "critical mental abilit[ies] for performing unskilled work."  (Id. (citing POMS DI 25020.010(B)(3)(k), (m)).) Further, Plaintiff maintains that the state agency psychological consultants' narrative explanations of the mental RFC "consist only of conclusory statements without any stated reasons or bases and do not address all the moderate limitations opined in the sections that [a]ffect [Claimant's] [RFC]."  (Id. at 17.)  Those contentions do not warrant reversal or remand.

As discussed above, the ALJ properly accounted in the RFC for Claimant's moderate limitation in the ability to accept instructions and respond appropriately to criticism from supervisors by limiting Claimant to only "occasional contact" with such individuals. (Tr. 15.) Moreover, the ALJ gave "great weight" to the opinions of state agency psychological consultants (Tr. 20), who concluded, in the narrative portion of the mental RFC form, that, despite "[m]oderate[] limit[ation]" in "[t]he ability to accept instructions and respond appropriately to criticism from supervisors," Claimant remained capable of performing work "in settings with no demand for extensive social interactions." (Tr. 156, 170.)

With regard to Claimant's moderate limitation in the ability to respond appropriately to changes in the work setting, the ALJ adequately accommodated that limitation by restricting Claimant to "routine" and "repetitive" unskilled work. (Tr. 15.) Moreover, the ALJ accorded "great weight" to the state agency psychological consultants (Tr. 20), who opined, in the narrative portion of the mental RFC form, that, notwithstanding "[m]oderate[] limit[ation]" in "[t]he ability to respond appropriately to changes in the work setting," Claimant remained able to "adapt to routine changes in simple tasks" (Tr. 157, 170). The state agency psychological consultants' explanations in the narrative portions of the mental RFC forms suffice to explain their ultimate conclusions. See Jones

<u>v. Astrue</u>, No. 6:11-CV-00721, 2012 WL 6892765, at *10 (S.D.W. Va. Nov. 27, 2012) (unpublished) (finding state agency psychological consultant's explanation in narrative section of mental RFC form adequately explained why limitation to simple, routine, repetitive work tasks involving simple instructions would reasonably account for moderate limitation in ability to respond appropriately to changes in work setting), <u>recommendation adopted</u>, 2013 WL 209484 (S.D.W. Va. Jan. 17, 2013) (unpublished).

Accordingly, the ALJ did not err in his evaluation of the state agency psychological consultants' opinions.

### III. CONCLUSION

Although Plaintiff has sufficiently demonstrated that he possesses Article III standing in connection with Claimant's application for DIB, Plaintiff has not established an error warranting reversal or remand.

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion for Dismissal of Complaint (Docket Entry 10) be denied as moot, that Plaintiff's Motion for a Judgment Reversing or Modifying the Decision of the Commissioner of Social Security, or Remanding the Cause for a Rehearing (Docket Entry 8) be denied, and that judgment be entered dismissing this action.

/s/ L. Patrick Auld

**L. Patrick Auld**
**United States Magistrate Judge**

September 1, 2017